Blauvelt *v.* Van Winkle.

---

ANNETTA BLAUVELT

*v.*

BELINDA VAN WINKLE and others.

1. A legacy charged on lands, and given to trustees to hold until the legatee should attain her majority, retains preference over a mortgage given on a part of said land, which was released, without consideration, by the guardian of the legatee, with the advice of the attorney of the mortgagee.

2. That the guardian gave bond, and charged himself with the amount of such legacy, when he executed the release, does not impair the lien.

3. In marshalling the assets of the estate, debts due from the testatrix must have priority over such legacy.

Bill for relief.    On final hearing on pleadings and proofs.

*Mr. G. Ackerson, Jr.*, for complainant.

*Mr. W. M. Johnson*, for defendants.

THE CHANCELLOR.

Lavinia Westervelt, late of Bergen county, deceased, by her will, made in 1868, after giving to her daughter, Mrs. Belinda Van Winkle, in fee, all her lands, tenements, hereditaments, and real estate whatever and wheresoever, subject to the charges imposed thereon in the will, gave to her granddaughter, the complainant, $10,000, to be paid to her at the age of twenty-one years.    She then gave to her executors (her daughter Belinda, Rev. Cornelius Blauvelt, father of the complainant, and the defendant, John W. Van Winkle, son of her daughter Belinda), whom she thereby appointed guardians of the complainant until the latter should attain to her majority, the above-mentioned legacy of $10,000, to be paid to them in three years after the decease of the testatrix, or sooner if her executors should so elect, and to be securely invested by them, and the interest to be employed and expended by the executors in quality of guardians, for the support, maintenance, and education of the complainant.    And she charged the real estate devised to her daughter with her debts and that legacy, in case her personal estate should not be sufficient to pay them, and ordered that so much thereof be sold from time to time by her executors as would meet the payment of the debts and legacy.    Mrs. Van Winkle, and her son, John P. Van Winkle, proved the will, and assumed the executorship, but the other executor, the complainant's father, declined to do so, deeming it unnecessary, because of his confidence in his co-executors, and being unable, without inconvenience, to attend to the settlement of the estate, he being the pastor of a church in the state of New York.    In February, 1869, Mrs. Van Winkle was desirous of borrowing $2,000 from

the Mutual Life Insurance Company of New York, on mortgage of part (the most valuable portion) of the land so devised to her. The company, however, would not accept a mortgage as security, subject to the lien of the legacy which had not, nor had any part of it, been then paid or raised. Thereupon it was agreed between Mrs. Van Winkle, John P. Van Winkle, and the company, that the land which it was proposed to mortgage, should be released from that lien, and it was understood that John P. Van Winkle should take out letters of guardianship of the person and estate of the complainant, and give the bond required by law, and then release the land on which it was proposed to give the mortgage to the company from the lien of the legacy, and should take from his mother a mortgage on the rest of the property, to secure the payment of the amount of the legacy.

He, accordingly, on the 22d of February, 1869, took out letters of guardianship of the person and property of the complainant, his mother and his father-in-law being his sureties on his bond, and on the same day he released to his mother, from the lien of the legacy, the part of the premises which it was proposed to mortgage to the company, and took from her a mortgage on the rest of the land to secure the payment of $10,000 on the 10th of October, 1871. The consideration expressed in the release was one dollar. On the day on which the letters of guardianship were taken out, the mortgage to the company was given for the loan of $2,000, which was then made.

In November, 1871, Mrs. Van Winkle, desiring to borrow more money on security of mortgage on another part of the farm than that mortgaged to the company, it was agreed between her and John P. Van Winkle that, in order to enable her to do so, he would cancel the mortgage which she had given him, and take another of the same amount, to secure the payment of the amount of the legacy on the same property covered by the mortgage which he then held, excepting the part (a wood lot of twelve acres) which

8

it was proposed to mortgage for the security of the new loan. This was accordingly done. The mortgage of 1869 was cancelled of record without consideration, and a new one, to secure the payment of $10,000 in three years, with interest, was taken, which covered the same property, except the wood lot. On mortgage of the wood lot, Mrs. Van Winkle then borrowed $1,000 of Joseph Kingsland. This mortgage to Kingsland was afterwards cancelled, and another, for $2,000, given upon the same property therein described to Elizabeth Watson, in 1874.

On or about the 1st of April, 1870, Mrs. Van Winkle mortgaged a part of the land described in the mortgage to the life insurance company, to Caspar P. Westervelt, to secure the repayment of a loan of $1,600 made by him to her, and on or about the 11th of July, 1874, she mortgaged part of the same land covered by the company's mortgage to John De Graw, to secure the payment of $1,221.67. Under foreclosure proceedings, taken in this court on the mortgage of the company, the land covered by the respective mortgages of the company, Caspar P. Westervelt, and John De Graw, was sold to De Graw in January, 1877, and he now holds the property accordingly.

In March, 1870, John P. Van Winkle filed an inventory, as guardian, of the property of his ward in his possession. It consisted of certain articles of silver plate, and a few pieces of household furniture (all of which were specifically bequeathed to her by her grandmother, the testatrix), and the legacy of $10,000. In September of that year, he filed an account as guardian, in which he charged himself with the legacy of $10,000, and one and a half year's interest thereon, and prayed allowance to the amount of $872. The account was passed. The balance against him therein was $10,094.27. In February following, he filed another account, which was allowed. The balance against him therein was $12,667.57. He, in fact, never received either the legacy of $10,000 nor any interest thereon. The mortgage held by him as security for the amount of the legacy is

by no means a sufficient security for the money. It was probably supposed to be abundantly sufficient when it was taken, at the inflated price which real estate then bore. The bill is filed to establish the lien of the legacy upon the whole property. No attempt has been made to release any part of the property except the part mortgaged to the life insurance company. Though the mortgage to that company is dated on the 10th day of February, 1869, twelve days before the date of the release, it was not, in fact, delivered until the release had been delivered.

The delivery of the release was made an indispensable condition to the lending of the money by the insurance company on the mortgage, and the attorney of the company not only knew all the circumstances, but advised that the release be made and the mortgage to secure the amount of the legacy be taken on the rest of the farm. Indeed, he appears to have devised this as a method of clearing the part of the property which it was proposed to mortgage to the insurance company from the lien of the legacy. He knew, and the company therefore knew, that no part of the legacy had been paid; that the will made it a lien on the whole property, and that it provided that it should be raised, if need be, by sale of the farm. He and they are chargeable with notice that the release was a violation of the trust. The letters of guardianship were taken out in order to enable John W. Van Winkle to execute the release and take the mortgage for the legacy. That mortgage was merely a means of diminishing the security of the complainant. It is not intended to impute to either the attorney, or the company, or the guardian, any fraudulent design, nor to suggest that they meditated or supposed they were inflicting any injury on the complainant in the matter. Nevertheless, the transaction was a violation of the guardian's trust, and was of such a character as that it cannot be sustained. It must be held in equity to have been a fraud on the complainant. The lien of the legacy was not, under the circumstances, discharged by the release. *Terhune* v.

*Colton,* 2 *Stock.* 21; *Schenck* v. *Arrowsmith,* 1 *Stock.* 314; *Swarthout* v. *Curtis,* 5 *N. Y.* 301. The will clearly provided for the payment of the legacy. It ordered that so much of the farm as should be necessary for the purpose be sold to raise it, in case the personal estate of the testatrix should prove insufficient to pay the debts and the legacy. The whole farm was pledged to raising the money, in order that it might be invested. The will by no means contemplated the investment of the money on security of mortgage on the farm, but the contrary. The money was to be raised by the executors, if need be, by the sale of the farm, and was to be by them securely invested. The whole farm stood as security for the payment of the money until it was actually paid. The fact that the guardian gave security by guardian's bond, and charged himself with the whole amount of the legacy when he gave the release and took the mortgage, makes no difference. *Terhune* v. *Colton, ubi sup.*

One of the sureties on the bond was, as before stated, his mother, who was one of the testamentary guardians. The other was his father-in-law. The former has no property except her interest in the farm, and the latter is insufficient in estate to make the legacy secure. The guardian is insolvent. Nor does the fact that the ward, since she became of age, approved of the guardian's account, in which he charged himself with the legacy and interest thereon, estop her from denying the validity of the release. *Terhune* v. *Colton, ubi sup.* She then, in fact, knew nothing of the mortgage for her legacy or the release. She has never confirmed the release. She never heard of either the mortgage or the release until July, 1876, and then she immediately consulted counsel with a view to establishing her rights in the matter, and the result was this suit.

When Caspar P. Westervelt and De Graw took their mortgages, they had notice that the will made the legacy a lien on the land on which they proposed to take a mortgage security. They had notice that the lien had not been discharged, unless it were by means of the release, and they had notice,

also, by the very release itself, that it had been executed by the guardian of an infant, without any consideration whatever. Had they made inquiry, they would have ascertained that the legacy had not only not been paid, but that there was no pretence that it had. Had they inquired of John W. Van Winkle, he would have told them that the legacy was not paid, that the release and the mortgage to him for $10,000 and his guardianship and inventory were merely the parts of a plan to narrow the lien of the legacy, to the end that part of the property subject to the lien might be by those means freed from it. They are chargeable with the information which they might have obtained by inquiry. De Graw's position as purchaser under the foreclosure sale is no better than his position as mortgagee. He, as well as all those under whom he claims, had notice. Miss Watson, when she took her mortgage, had notice of the lien of the legacy on the whole property; that part of the property had been released without consideration, and that a mortgage for $10,000, the amount of the legacy, had been executed to the guardian, to secure the amount of the legacy. She knew that the part on which she proposed to take a mortgage had never been released at all. She had notice that the first mortgage for $10,000 had been cancelled, without consideration, merely to enable the devisee of the land to mortgage part of the land described in it to Kingsland. For all these things she might have known on inquiry, if she did not, in fact, know them, and, as before remarked, the consequences are the same.

Brown took his conveyance before any release or mortgage was executed. He holds subject to the lien of the legacy. The mortgage which was given to De Graw was given for the amount of a note (and interest) given to him by the testatrix. Of the money received from the insurance company, $804.72 were used in paying the debts of the testatrix's estate. The Westervelt judgment is said to be for a debt due to Jasper Westervelt from the testatrix. De Graw has an equity, to the extent of the amount of his mortgage and

the above-mentioned amount of $804.72, superior to that of the complainant. It does not appear that any of the money, the payment of which was intended to be secured by the Watson mortgage, or the money received from Brown, went to pay the debts of the estate. Neither Miss Watson nor Brown has any equity superior to that of the complainant. Jasper Westervelt may have an equity superior to hers, his debt having been, as is alleged, originally due from the testatrix.

There are but three other unpaid debts of the estate. One of them is held by the guardian, another by his father-in-law (Peter P. Westervelt), who, as before stated, is one of his sureties as guardian, and the third by Margaret Westervelt. Of course the guardian has, under the circumstances, no equity for the payment of his debt. He is executor and has wasted the personal estate. Margaret Westervelt and Peter P. Westervelt both have, notwithstanding the latter is surety for John P. Van Winkle, as guardian, if their debts are still subsisting and valid, and therefore enforceable against the estate, an equity for their debts superior to that of the complainant. Neither of them is a party to this suit. They and Jasper Westervelt should be afforded an opportunity of proving their claims, and, if they are valid, of obtaining payment.

The whole farm is subject to the lien of the legacy. It should be sold as follows: First, the part covered by the $10,000 mortgage, to raise, in the first place, the amount due to Jasper Westervelt on his claim, for which he recovered his judgment, and what is due on the notes held by Margaret Westervelt and Peter P. Westervelt, if those claims held by Jasper, Margaret and Peter P. Westervelt, respectively, are valid claims against the estate of the testatrix; and, in the next place, the amount due to the complainant on her legacy, with her costs of this suit. If sufficient shall not be thus raised to meet those payments, then the part mortgaged to Miss Watson, and the part conveyed to De Graw by the sheriff, should be sold to pay their respective propor-

tions of the balance. In establishing the proportions, the amount due De Graw for his debt and interest, and the $804.72 and interest, should be deducted from the value of the land conveyed to him. If there should still be a deficiency, the land conveyed to Brown should be sold to raise it.

There will be a reference to ascertain the amounts due, if anything, to Jasper, Margaret and Peter P. Westervelt, respectively, from the estate of the testatrix; the amount due to De Graw for principal and interest on his debt, and the $804.72, with interest, and also what is due to the complainant on her legacy, and to ascertain the proportions which the part mortgaged to Miss Watson, and the part conveyed to De Graw, are to bear.